IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| MEAGAN NORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case. No. 3:18-cv-1057-RAH |
| | ) | (WO) |
| OPELIKA CITY BOARD | ) | |
| OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Meagan Norris ("Norris"), a special education teacher formerly employed with Defendant Opelika City Board of Education ("OCBOE" or "Board"), brings this First Amendment retaliation case under the Americans with Disabilities Act, *see* 28 C.F.R. § 35.134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Norris claims that she was terminated in retaliation for purportedly "advocating" on behalf of one of her special education students. The OCBOE disputes this allegation, asserting that Norris's probationary contract was nonrenewed because of performance-related issues and that the decision to nonrenew her contract predated any alleged protected activity.

Pending before the Court is the OCBOE's *Motion for Summary Judgment*.[1] (Doc. 51.)  For the following reasons, the OCBOE's motion is due to be DENIED.

---

[1] Norris also has filed a *Motion to Supplement Summary Judgment Record* (Doc. 74), which seeks to supplement her summary judgment motion with an additional exhibit.   The OCBOE also has filed a *Motion for Leave to File Response to Plaintiff's Reply*.  (*See* Doc. 84.)  Both motions will be granted.

## I.    BACKGROUND

In 2016, Norris was hired by the OCBOE under a one-year probationary contract to teach in a newly created, self-contained special education classroom at Jeter Primary School beginning that Fall (the 2016-2017 school year). (Docs. 51-2, pp. 10-12; 51-4, p. 27.)    This position was her first full-time teaching experience. (Doc. 51-4, p. 30.) Following her first year, her contract could be nonrenewed or renewed annually for a maximum of three years. (Doc. 51-1, p. 2.) She was nonrenewed at the end of the 2017-2018 school year following her second year at Jeter.[2]

### A. First Year (2016-2017 School Year)

Norris was assigned eight to ten students in her classroom during her first year, (Doc. 51-2, pp. 12-13), and had two aides ("paraprofessionals") in the room with her for assistance: Tracie Dunn and Charity Ogle, who was replaced by Brandee Allen after Christmas. (Doc. 51-2, pp. 13-14.)

Believing that Norris was struggling in certain areas, during the first school year, the OCBOE brought in Dr. Robert Simpson, an outside consultant regularly used by the OCBOE to provide assistance to struggling teachers, (Docs. 51-10, pp. 8-10; 51-11), to evaluate Norris and provide recommendations and strategies on how she could improve her classroom environment and make it a success, (Docs. 51-4, pp. 25-26, 51-52; 51-11, p. 2).

---

[2] Norris has been employed as a special education teacher for the Lee County School System at West Smiths Station Elementary School since 2018.

Dr. Simpson made his first recommendations to Norris in September 2016, (Doc. 51-10, pp. 13-14), and returned in October 2016 with additional recommendations, (Doc. 51-10, p. 15). One issue of concern was an occasion in which he personally observed Norris inappropriately speak to a child in her classroom. (Doc. 51-10, pp. 16-17.) All told, it was his belief that "[Norris] was failing" to provide a Free Appropriate Public Education[3] ("FAPE") to several of her assigned students. (Doc. 51-10, pp. 4-5.) Because of his concerns, in May 2017, Dr. Simpson provided Norris with a written list of thirteen recommendations for her to implement. (Docs. 51-10, p. 5; 51-4, p. 57.)

In addition to periodic visits from Dr. Simpson, Assistant Superintendent Jeanie Miller visited Norris's classroom for periodic walk-throughs on five to ten occasions during Norris's first year. (Doc. 51-6, p. 10.) During the second semester (early 2017), Miller spoke with Principal David Carpenter about her concerns in Norris's classroom, including behavior management and implementation of workstations, (Doc. 51-6, pp. 12-13), and given these concerns, ultimately discussed with Principal Carpenter whether Norris should be renewed for a second year, (Doc. 51-6, pp. 15-17).

Cynthia Landry-Booth, the Special Education Coordinator at the OCBOE, also observed Norris during her first year and expressed concerns to Principal Carpenter about

---

[3] The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. requires states that receive federal funds to provide FAPE to children with certain disabilities. The IDEA is intended "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." *Ortega v. Bibb Cty. Sch. Dist.*, 397 F.3d 1321, 1324 (11th Cir. 2005) (quoting 20 U.S.C. § 1400(d)(1)(A)). Under the IDEA, schools evaluate each child with a disability and develop an individualized education program (IEP), which sets forth educational and developmental goals for the child. *Id.* The IDEA also affords parents the right to file a complaint with the school district and attend a due process hearing if they are not satisfied with the child's IEP. *Id.* at 1325.

Norris's lack of implementation of classroom management strategies, failure to follow-through with recommendations from administrators, and failure to follow best practices. (Doc. 51-7, p. 20.)  She too believed that the Board should not renew Norris for a second year.  (Doc. 51-7, pp. 16-19, 23-24.)

Despite the concerns about Norris, Superintendent Mark Neighbors, Principal Carpenter and Assistant Superintendent Miller nevertheless wanted to afford her an opportunity to improve. They believed she could do so with the assistance of Dr. Simpson and additional professional development over the summer, and therefore they decided to renew Norris's contract for a second year.  (Docs. 51-4, pp. 40-42; 51-5, pp. 7-10; 51-6, pp. 16-17.)

## B.  Second Year (2017-2018 School Year) - Performance and Nonrenewal

According to the OCBOE, Norris's second year did not begin as hoped despite Dr. Simpson's work with Norris during the previous school year and over the summer.  Almost immediately, it appeared that Norris was not implementing the strategies that Dr. Simpson previously had recommended. (Doc. 51-6, pp. 14, 15-18.)  When Dr. Simpson observed Norris in September 2017, he gave her low ratings on several of the thirteen recommendations he had previously given her. (Doc. 51-4, pp. 46-50, 57.)  And on a written evaluation form, he noted "very little to no implementation" and gave Norris a score of zero on six of the thirteen recommendations.  (Doc. 51-4, pp. 46-50, 57.)[4]

---

[4] The OCBOE references statements Norris made in her own deposition in which she admitted that Principal Carpenter believed she was not implementing the recommendations of Dr. Simpson and another resource teacher. (*See* Doc. 52, p. 16.) The parties have spent considerable effort arguing their respective positions regarding this claimed testimony. But from the Court's perspective, it is a moot issue because no party, not even the OCBOE, has filed the relevant testimony with the

Superintendent Neighbors, Principal Carpenter, Assistant Superintendent Miller and Special Education Coordinator Landry-Booth claim they spoke among themselves in late September 2017 about Norris's lack of progress. (Docs. 51-5, p. 15; 51-6, pp. 19-20; 51-7, pp. 26-27.) The consensus was that they should not renew Norris's contract for another year, (Docs. 51-4, pp. 14-16; 51-6, pp. 19-20; 51-7, pp. 10-12), although they determined that in order to minimize disruption in the classroom, she could finish the year, (Doc. 51-4, pp. 14-15).   In his deposition, Dr. Simpson confirmed that the decision to nonrenew Norris's contract was made early in the 2017 school year, as he specifically recalled the issue being discussed during a meeting with Superintendent Neighbors and Principal Carpenter on October 11, 2017. (Doc. 51-11, pp. 2-3.)

Principal Carpenter also claims to have documented their discussions in contemporaneous notes.  (Doc. 51-5, pp. 47-62.)  But a review of these notes reveals, as Norris argues, several inconsistencies in dates and events, thereby undermining the veracity of the notes and suggesting that Carpenter generated them after-the-fact.  (Docs. 51-5, pp. 47-62; 82, pp. 1-2.)

Despite these internal discussions, Norris was not told of the decision nor was it formally or informally documented by the Board.

### C.  Second Year (2017-2018 School Year) - November 2017 Advocacy Issue

In early November 2017 during the physical education class for her students, Norris observed that Deborah Bailey, one of the P.E. teachers, was segregating one of Norris's

---

Court, even when prompted to do so, (*see* Doc. 76).  As such, these statements and the arguments surrounding them will be ignored.

special education students, C.W., through the use of a tape barrier. (Docs. 51-2, p. 5; 63-3, p. 14.)  This practice was contrary to C.W.'s written IEP, which required that C.W. be mainstreamed with general education students during P.E. (Docs. 52, p. 19; 58-1, p. 4.)

Norris voiced her opposition to this practice to Principal Carpenter on November 2, 2017. (Doc. 51-2, pp. 7-8.)  According to Norris, she told Carpenter "this cannot happen," "it's segregation, it's hurtful, at the end of the day, forget the legal side of it, it's just mean." (Doc. 57-1.)    Carpenter disputes that this conversation ever occurred, although he acknowledged having a conversation with Bailey about the inappropriate use of the tape barrier in early November.  (Doc. 51-5, p. 56.)

It seems Principal Carpenter agreed with Norris's complaints about the tape barrier, seeing as it was removed the following day. (Doc. 51-2, p. 6.)  However, this solution was short-lived because the tape barrier reappeared during P.E. the following Monday.  (Doc. 51-2, p. 8.) According to Norris, she once again complained to Principal Carpenter about the P.E. teachers' (Bailey and Leann Scroggins) use of the tape barrier. (Doc. 51-2, p. 8.) But despite her continued protestations to Principal Carpenter, C.W. continued to be segregated by the P.E. teachers through the end of the Fall 2017 semester and into the Spring 2018 semester. (Doc. 58-1, p. 4.)

### D.  Second Year (2017-2018 School Year) - April 2018 Due Process Hearing

On March 27, 2018, C.W.'s father met with Norris to complain about the ongoing segregation of C.W. during P.E.  A family member videotaped the meeting.  (Doc. 57-1.) During the meeting, Norris told the father that the segregation had been occurring since October and that she had told Principal Carpenter that it could not happen. Principal

Carpenter, she continued, had told the P.E. teachers to end the segregation, and though they temporarily removed the barrier, the P.E. teachers put it up again a few days later. Norris informed the father that she had continued to complain to Principal Carpenter about the issue. (Docs. 57-1; 58-15.)

The following day, March 28, 2018, Bailey authored a memorandum in which she detailed some of the events of March 27, 2018. Specifically, she detailed a confidential conversation between Norris and a co-employee, as reported to Bailey by the co-employee. (Doc. 74-1.) Based on Bailey's memorandum, Norris had said that Jeter Elementary was about to be "blindsided" with a lawsuit against Principal Carpenter, Bailey and Scroggins involving the segregation of C.W.[5] (*Id*.) According to notes drafted by Principal Carpenter, Bailey told him about this conversation that same day. (Doc. 51-5, p. 54.)

C.W.'s father retained legal counsel, and on April 4, 2018, filed a request for a due process hearing with the Alabama Department of Education, alleging that, during P.E., C.W. had been denied educational services in what was his least restrictive environment. (Doc. 58-1, p. 1.)

Norris participated in a pre-resolution meeting on April 13, 2018, which she secretly recorded, concerning C.W. Norris claims that, during the meeting, she "advocated for" C.W. – and against the school – and corrected several misstatements made by Principal Carpenter. (Doc. 51-2, pp. 46-48.)

---

[5] In her deposition taken July 9, 2019, Bailey first denied having any information that Norris had reported her use of the tape barrier in P.E. class to Principal Carpenter. (Doc. 74-2, p. 2.) But when confronted with the memorandum, she acknowledged authoring the memorandum that suggested otherwise. (Doc. 74-2, pp. 2-3.)

While the due process hearing was pending, two weeks later on April 25, 2018, Bailey and Scroggins told Principal Carpenter that they had observed Norris improperly drop another special education student after holding him by one leg and one arm. (Docs. 51-8, pp. 6-7; 51-9, pp. 7-10; 58-6, pp. 10-12.)  Principal Carpenter spoke with Norris's two assigned paraprofessionals, Dunn and Allen, neither of whom confirmed the incident reported by the P.E. teachers. (Docs. 51-4, pp. 8-10, 13; 51-15, p. 3.)

Two days later after a discussion with Superintendent Neighbors, Principal Carpenter reported Norris for child abuse to the Alabama Department of Human Resources (DHR). (Doc. 58-10, pp. 26-28.)  Norris was not informed of the allegation before Principal Carpenter filed the report, nor did he give her an opportunity to tell her side of the story. (Doc. 58-10, p. 30.)

On April 30, 2018, Superintendent Neighbors met with Norris and informed her that she was being removed from her classroom. (Doc. 58-10, pp. 34-36.) According to Norris, Superintendent Neighbors refused to hear what allegedly had happened. (Doc. 58-10, pp. 30-31.)

The same day, C.W.'s attorney produced the video of Norris's March 27, 2018, meeting with C.W.'s father to the OCBOE as part of the witness and exhibit list exchange for the due process hearing. (Docs. 57-1; 63-4.)  The OCBOE claims this exhibit exchange constituted the Board's first knowledge of Norris's March 27, 2018, meeting or the video, even though Bailey had authored the memorandum a month earlier detailing her discussion about Norris's meeting and the anticipated lawsuit by C.W.'s family against the OCBOE, Principal Carpenter and the P.E. teachers.  (Docs. 61, p. 13; 62, p. 4.) According to

8

Principal Carpenter's contemporaneous notes, he learned of C.W.'s visit with Norris and Norris's statements about a lawsuit that same day.  (Doc. 71-4.)

When Special Education Coordinator Landry-Booth learned of and saw the video, she determined Norris's actions were "not normal" and concluded that Norris was not playing for "team Opelika City Schools and therefore she decided to no longer engage with Norris." (Doc. 58-8, pp. 46-47.)

C.W.'s due process hearing occurred on May 7, 2018. (Doc. 63-3.)   Principal Carpenter testified at the hearing, but Norris did not.  (Docs. 51-1, p. 3; 63-3, p. 10.)

On May 21, 2018, the hearing officer released his decision on the due process complaint filed by C.W.'s parents concerning the tape barrier. (Doc. 58-1.)  In his decision, due to jurisdictional issues, the hearing officer did not find that the tape barrier was a violation of C.W.'s rights. (Doc. 58-1, p. 10.)   Instead, the hearing officer faulted the OCBOE with removing C.W. and six other special education students from the general P.E. class without first properly modifying their IEPs. (Doc. 58-1, pp. 4-6.)  He also ordered relief that required the OCBOE to train its teachers and pay attorney's fees to C.W.'s attorney.  (Doc. 58-1, pp. 11-14.)

The following day, May 22, 2018, Superintendent Neighbors recommended to the OCBOE that it not renew Norris's contract, which the Board accepted during its meeting that day. (Doc. 51-5, pp. 23-25.)

On June 26, 2018, after interviewing the child's parents, Principal Carpenter, Norris, and the paraprofessionals, DHR ended its investigation of Norris and closed the abuse case, finding that child abuse by Norris was "not indicated."  (Doc. 51-12, p. 12.)

### E.  Norris's Performance Evaluations

In their deposition testimony, Dr. Simpson, Principal Carpenter and others insisted Norris's performance issues were the basis for the decision to nonrenew her contract, but Norris nonetheless had received favorable written performance evaluations during her two years with the OCBOE. (Doc. 59, p. 30.)  Specifically, Norris underwent four evaluations in the 2016-2017 school year. (Docs. 56-2 (Fall 2016); 56-20 (Fall 2016 *Professional Learning Plan*);  56-4 (Spring 2017); 56-6 (Spring 2017); 56-8 (Spring 2017); 56-10 (Spring 2017 *Professional Standards Report*); 56-20 (Spring 2017 *Professional Learning Plan*).)  During the 2017-2018 school year, Norris received additional evaluations. (Docs. 56-12 (Fall 2017); 56-22 (Fall 2017 *Professional Learning Plan*); 56-14 (Spring 2018); 56-16 (Spring 2018); 56-22 (Spring 2018 *Professional Learning Plan*).)  These included mostly neutral-to-favorable written evaluations, (*see* Docs. 56-2, 56-4), including favorable evaluations from Special Education Coordinator Landry-Booth (Docs. 56-4; 56-8; 56-12; 56-16), and Principal Carpenter, (Docs. 56-6; 56-10; 56-14).

In her deposition, Special Education Coordinator Landry-Booth acknowledged that Norris delivered FAPE to each of her students during the entire 2016-2017 and 2017-2018 school years and that she never believed otherwise. (Doc. 58-8, pp. 34-35.)  Landry-Booth even wrote in November 2017 that "[a]ll students in the classroom had an IEP and individual students' needs were met." (Doc. 58-8, p. 56.)

 Nor did Principal Carpenter testify that Norris failed to provide FAPE to each of her students. (Doc. 58-6, pp. 47-48.)  He also agreed that Special Education Coordinator

Landry-Booth's April 20, 2018, written report concluded that Norris was delivering FAPE to each child in her class. (Doc. 58-6, pp. 44-45.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(a), (c).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Just as important, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In making this assessment, the Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted), and "resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F. 2d 1555, 1558 (11th Cir. 1990) (citation omitted).

## III.   DISCUSSION

Norris contends that she was subjected to retaliatory treatment in violation of the ADA and Section 504 of the Rehabilitation Act after, during her second year of teaching, she advocated for one of her special education students who was wrongfully segregated in

11

violation of the IDEA during the student's physical education class.   Norris contends that retaliation occurred in four ways: (1) she was reported to DHR on a false allegation of child abuse, (2) she was removed from her classroom, (3) her efforts to obtain her master's degree were threatened, and (4) her teaching contract was not renewed. (Doc. 1, p. 3.)  The OCBOE[6] denies that Norris engaged in any protected conduct and that any retaliation occurred, and it further asserts that there were legitimate, nonpretextual reasons for each action.

"Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, [the Court will] discuss those claims together and rely on cases construing those statutes interchangeably."  *Allmond v. Akal Sec., Inc*., 558 F.3d 1312, 1316 n. 3 (11th Cir. 2009) (per curiam) (citing *Cash v. Smith*, 231 F.3d 1301, 1305, 1305 n. 2 (11th Cir. 2000) ("Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases" and "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa.")).

The ADA and Section 504 of the Rehabilitation Act provide for retaliation claims. *E.g., Palmer v. McDonald*, 624 F.App'x 699, 702 (11th Cir. 2015) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1287 (11th Cir. 1997)).  In cases such as this one, where the plaintiff does not bring forward direct evidence of retaliation, the Court must analyze the claim using the familiar circumstantial evidence burden-shifting framework. *See Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1264 (11th Cir.

---

[6] In her Complaint, Norris also sued Principal Carpenter under Section 1983, (*see* Doc. 1, Count III); however, Carpenter since has been dismissed as a defendant.

2010); *Wilbourne v. Forsyth Cty. Sch. Dist.*, 306 F.App'x 473, 475 (11th Cir. 2009) (citing *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1328 (11th Cir. 1998)). A plaintiff must first establish a prima facie case of retaliation. *Johnson v. Booker T. Washington Broad. Servs., Inc.*, 234 F.3d 501, 507 n. 6 (11th Cir. 2000). If she is able to do so, the burden shifts to the defendant to provide a legitimate reason for the adverse employment action. *Id.* Assuming such a reason is provided, the plaintiff must show that the proffered reason was merely pretext for retaliation. *Id.*

To establish a prima facie case of retaliation, Norris must establish that (1) she engaged in statutorily protected expression; (2) there was an adverse action against her; and (3) there is a causal link between the protected expression and the adverse action. *Goldsmith v. City Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). If the prima facie case is established, "the [OCBOE] may come forward with legitimate reasons for the [challenged] action to negate the inference of retaliation." *Id*. (citations omitted). If the OCBOE meets this burden, Norris "then bears the burden of proving by a preponderance of the evidence that the reasons offered by the [OCBOE] are pretextual." *Id.* (citations omitted).

The inquiry into pretext requires the Court to determine, when viewing all the evidence, whether Norris has raised sufficient doubt as to the OCBOE's proffered nondiscriminatory reasons to allow a reasonable factfinder to conclude the OCBOE's proffered legitimate reasons were not the actual motives for its conduct. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). Norris may not establish pretext simply by questioning the wisdom of the OCBOE's reason. *Id*. at 1543. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee

must meet that reason head on and rebut it." *Chapman v. AI Transport*., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). The inquiry into pretext centers on the OCBOE's beliefs, rather than Norris's own perceptions. *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). Where a defendant offers extensive evidence of legitimate, nondiscriminatory reasons for its actions, conclusory allegations by the plaintiff are insufficient to raise an inference of pretext. *Mayfield v. Patterson Pump Co*., 101 F.3d 1371, 1376 (11th Cir. 1996).

## A. Adverse Employment Action

As a threshold matter, the OCBOE argues that many of Norris's alleged retaliatory actions do not constitute actionable adverse employment actions as a matter of law. In her Complaint, Norris raises four retaliatory actions by the OCBOE: (1) she was reported to DHR on a false allegation of child abuse, (2) she was removed from her classroom, (3) her efforts to obtain her master's degree were threatened, and (4) her teaching contract was nonrenewed. In its motion, the OCBOE appropriately acknowledges that the nonrenewal/termination constitutes an adverse employment action but argues that the other three actions do not. *See Herron-Williams v. Alabama State University*, 287 F.Supp.3d 1299, 1317 (M.D. Ala. 2018) (concluding that expiration and nonrenewal of plaintiff's contract constituted an adverse employment action); *Ghioroaie-Panait v. Rolle*, No. 3:17-cv-698-WKW, 2018 WL 1722395, at * 6 (M.D. Ala. Feb. 13, 2018) ("Certainly, the nonrenewal of an employment contract alone would dissuade the reasonable worker from making a charge of discrimination.").

"[N]ot all conduct by an employer negatively affecting an employee constitutes

14

adverse employment action." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). The standard for evaluating whether an employment action is adverse for purposes of a retaliation claim does not require that pay be impacted, but instead requires proof that a reasonable employee would have found the challenged action "materially adverse," in that it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington No. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006).

The Court agrees with the OCBOE that Norris's removal from the classroom without any reduction in pay or benefits and the *threats* to her master's degree do not constitute actionable adverse employment actions under the facts in this case or under governing Eleventh Circuit precedent.  *See, e.g., Worley v. City of Lilburn*, 408 F.App'x 248, 252 (11th Cir. 2011) ("[U]nwarranted reprimands, a negative work evaluation, threat of job loss through dissolution of the plaintiff's division, threat of suspension without pay, removal of job duties, and exclusion from meetings did not constitute adverse employment actions, either singly or when considered in the aggregate."); *Moore v. Miami-Dade Cty*., No. 02-33421-CIVGOLD, 2005 WL 3273722, at *11 (S.D. Fla. Sept. 30, 2005) (concluding that placement on paid administrative leave for little over one month during the pendency of internal investigation was not an adverse employment action) (citing *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000) (finding that approximately three-month paid administrative leave was not adverse employment action for purposes of First Amendment retaliation claim pursuant to Section 1983)). Furthermore, Norris does not attempt to address these actions in her summary judgment brief, and therefore she has

effectively abandoned these claims.[7] *See, e.g., Hudson v. Norfolk Southern Ry. Co*., 209 F.Supp.2d 1301, 1324 (N.D. Ga. 2001) (providing that when a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned) (citing *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995)).

This leaves for analysis the allegedly false child abuse report to DHR. While she ultimately was cleared of the child abuse allegations, Norris contends that because she was, in fact, investigated for child abuse, her name is now permanently on DHR's child abuse registry, and future employers "[w]ill know that she was accused of abuse of one of her students." (Doc. 59, p. 69.)

Norris need not claim that the OCBOE's actions impacted her current employment status in order to properly allege an actionable adverse employment action. In the context of a retaliation claim, "the type of employer conduct considered actionable has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related." *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008). Under this "decidedly more relaxed" standard, a materially adverse action is one that "well might have dissuaded a reasonable worker from making...a charge of discrimination." *Id*. at 973-74 (quoting *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 68).

---

[7] During oral argument, Norris's counsel conceded that Norris was no longer advancing these claims.

Here, the Court concludes that, when viewed in the light most favorable to Norris at the summary judgment stage, the OCBOE's report of Norris for child abuse to DHR constitutes an actionable retaliatory adverse employment action. Because of the investigation that followed the report to DHR, several of Norris's co-workers were interviewed and thereby made aware of the abuse allegations. Norris will be forever stigmatized by the accusation, and her name will be attached to an accusation of child abuse by future prospective employers who make inquiries[8] in the DHR database. *See, e.g., Weixel v. Bd. Of Educ. of N.Y.*, 287 F.3d 138, 149 (2nd Cir. 2002); *Jenkins v. Rock Hill Local School District and Evans*, 513 F.3d 580, 589 (6th Cir. 2008). While "trivial harms" and "petty slights" do not constitute adverse employment actions, a report of child abuse to DHR about an educator, even if later proven inaccurate or unsubstantiated, appears to rise above "trivial harms" and would dissuade a reasonable worker from making or supporting a charge of discrimination. *Entrekin v. City of Panama City Fla.*, 376 F.App'x 987, 995 (11th Cir. 2010).

Accordingly, the OCBOE is not entitled to summary judgment to the extent Norris relies upon the DHR report and the nonrenewal of her employment contract as adverse employment actions.

### B. Protected Activity

Next, the OCBOE argues that Norris did not engage in protected activity[9] when she

---

[8] An educator, such as Norris, can seek to have her "not indicated" finding expunged from the central child abuse registry after five years. *See Byrd v. Buckner*, No. 18-CV-122-RAH-SRW, 2020 WL 2046375, at *3 (M.D. Ala. Apr. 20, 2020) (explaining DHR's child abuse registry).

[9] In its reply in support of summary judgment, the OCBOE argues (for the first time) that Norris

complained to Principal Carpenter in November 2017 and thereafter about the impermissible tape barrier; met with the father of C.W. on March 27, 2018 while being videotaped about the tape barrier; and participated in a pre-resolution meeting about the tape barrier on April 13, 2018.

A person "engages in statutorily protected activity if [she] has opposed any ... practice made unlawful by" section 504 of the Rehabilitation Act. *See Morales v. Georgia Dept. of Human Resources*, 446 F.App'x 179, 183 (11th Cir. 2011). Under both the ADA and the Rehabilitation Act, protected conduct also can include testifying, assisting, and participating in any manner in an investigation, proceeding or hearing. *See Chapman v. Wilkie*, No. CV-318-014, 2019 WL 1509604, at *2 (S.D. Ga. Apr. 5, 2019)(explaining retaliation under the ADA and Rehabilitation Act). It can also include advocacy concerning violations of the IDEA by a school district. *Draper v. Atlanta Public School Dist.*, No. 1:07-CV-0224-MHS, 2008 WL 11381574, at * 8 (N.D. Ga. Mar. 31, 2008); *Houlihan v. Sussex Tech. School Dist.*, 461 F.Supp.2d 252, 258 (D. Del. 2006); *P.N. v. Greco*, 282

---

did not exhaust her administrative remedies as she must under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. (Doc. 62, p. 5.)  An argument raised for the first time in a reply brief cannot be considered, *see Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1353 (11th Cir. 2005), but even if the Court did consider it, the Supreme Court has dispensed with that requirement for suits brought outside the IDEA. *E.g.*, *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 754-755 (2017) ("(I)f, in a suit brought under a different statute, the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required. (…) A school's conduct toward such a child—say, some refusal to make an accommodation—might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA. A complaint seeking redress for those other harms, independent of any FAPE denial, is not subject to § 1415(l)'s exhaustion rule because, once again, the only 'relief' the IDEA makes 'available' is relief for the denial of a FAPE."). Norris is not seeking relief for denial of C.W.'s FAPE, which was already addressed in the due process hearing requested by the child's family; rather, Norris is suing for retaliation for repeatedly reporting to Principal Carpenter the tape barrier.

F.Supp.2d 221, 242 (D.N.J. 2003).

"[A] plaintiff's burden under this standard has both a subjective and an objective component." *Little v. United Technologies, Carrier Transicold Div*., 103 F.3d 956, 960 (11th Cir. 1997). "A plaintiff must not only show that [she] subjectively (that is, in good faith) believed that [her] employer was engaged in unlawful ... practices, but also that [her] belief was objectively reasonable in light of the facts and record presented." *Id*.

The Court concludes that, in the light most favorable to Norris, she engaged in protected conduct. First, the evidence, while disputed, shows that Norris complained to Principal Carpenter on November 2, 2017 about the OCBOE's (the P.E. teachers, in particular) impermissible use of a tape barrier with Norris's special education student. In that meeting, Norris stated that use of the tape barrier "cannot happen," "it's so unbelievably *against the law*," "it's segregation, it's hurtful, at the end of the day, forget the legal side of it, it's just mean, you can't do that." (Doc. 58-15 (emphasis added); *see also* Doc. 61, p. 8.) When the tape barrier was used again, Norris returned to Principal Carpenter and protested again. (Doc. 58-15; *see* Doc. 61, p. 10.) While it may be a disputed issue of material fact whether Norris raised the issue to Principal Carpenter for a second time, and to what extent, opposing a practice made unlawful under the IDEA demonstrates she engaged in protected activity.

Again, in the light most favorable to Norris, she also engaged in protected activity when she met with her student's father about the tape barrier and participated in the pre-resolution meeting, both of which concerned the OCBOE's use of the tape barrier, an issue which Norris already, and repeatedly, had complained about to the OCBOE. While

19

Norris's role may have been minimal and while she may not have emphatically opposed, encouraged or taken a position on anything, especially at the pre-resolution meeting, her attendance at these two events nevertheless constituted her participation "in any manner" in an investigation, proceeding or hearing concerning unlawful activities.  In short, the OCBOE is not entitled to summary judgment as a matter of law for lack of protected activity.

### C.  Teaching Contract Nonrenewal  – Causation and Pretext

The OCBOE also argues that it is entitled to summary judgment because Norris cannot meet her prima facie burden of showing a causal link between the adverse employment actions at issue (the DHR child abuse report and nonrenewal of her teaching contract) and her protected conduct.  According to the OCBOE, "there is no evidence that her expressing this opinion [i.e., about the cordoning-tape] to Principal Carpenter in any way related to the Board's decision to non-renew her probationary employment." (Doc. 52, p. 42; *see* Doc. 62, pp. 7-8.)  The OCBOE points to the deposition testimony of Principal Carpenter, Superintendent Neighbors, Miller, and Landry-Booth, all of whom testified via deposition that they, between themselves, decided in September 2017 not to renew Norris's contract at the end of the school year due to performance issues. (Docs. 51-4, pp. 14-16; 51-5, p. 15; 51-6, pp. 19-20; 51-7, pp. 10-12, 26-27.)  At that time, they claim that they lacked knowledge of Norris's protected activity because the protected activity had yet to occur.

Norris disputes the timing of this decision (or that it even occurred at all), pointing to the fact that she was neither terminated in September 2017 at the time the alleged

decision was supposedly made, nor was she told of any such decision.  Instead, as she points out, she was nonrenewed over six months later in May of 2018, and only after engaging in protected activity in November 2017, March 2018 and April 2018.  She also points to the timing of her nonrenewal, which came shortly after Bailey's March 28, 2018, memorandum, days after the video was made known to the OCBOE, and one day after the due process hearing officer issued his order finding that the OCBOE violated the rights of several of Norris's special education students. At that time, the decisionmakers would have been aware of Norris's protected conduct, but nevertheless decided to nonrenew her.

"[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006); *see also Buchanan v. Delta Airlines, Inc*., 727 F.App'x 639, 642 (11th Cir. 2008).

Yet here, the record evidence conflicts with the OCBOE's assertions that it discussed, contemplated, and decided to nonrenew Norris's employment contract before Norris complained to Principal Carpenter about the tape barrier in November 2017, before she met with C.W.'s father in March 2018, and before she participated in the pre-resolution meeting in April 2018. *Cf. Drago*, 453 F.3d at 1308. There is, for example, an alleged contemporaneous note[10] written by Principal Carpenter purportedly confirming the fact that he and Superintendent Neighbors met and collectively agreed that Norris should be

---

[10] As Norris has noted, there are credibility issues regarding the notes and in particular, whether they were indeed contemporaneous or generated after-the-fact.

nonrenewed, (*see* Doc. 51-4, pp. 14-15), but nowhere else is it documented that this decision was made in September 2017.   Instead, according to the administrators, they decided to retain Norris for the rest of the school year.   Further, no evidence is presented that Norris was informed of her nonrenewal at this time or that OCBOE made any efforts to implement or formally document this claimed decision.   As the written performance evaluations reveal, Norris conducted herself and her classroom in a satisfactory manner. This is in addition to the deposition testimony from several of the OCBOE officials in which they acknowledged that Norris provided FAPE to her students.  (Docs. 58-8, pp. 34-35; 56; 58-6, pp. 44-45, 47-48.)

Still, Norris cannot merely rely on temporal proximity between her communications concerning C.W. beginning in November 2017 and occurring up to and through April 2018 to show causation. If the decisionmaker – in this case, the OCBOE – did not have knowledge of the employee's protected conduct, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). After all, a "decision maker cannot have been motivated to retaliate by something unknown to him," regardless of whether the two events happened close in time.  *Id.*  And as is relevant for the Court to note here, the "cat's paw" theory of liability permits the discriminatory animus of a non-decisionmaker to be imputed to a neutral decisionmaker that acted as a mere conduit.[11]

---

[11] No assertion is made that the members of the Board conducted any independent investigation into the details of Norris's employment or the reasons for her nonrenewal.  From all that appears, the Board voted on the nonrenewal solely based upon the recommendation of Superintendent Neighbors.  To recover under the cat's paw theory, a plaintiff must show that the decisionmaker discharged her, without independently investigating the complaint against the plaintiff, based on

*Crawford*, 529 F.3d at 979 n. 21.

The question then is whether Norris has presented sufficient evidence of a causal link other than the temporal proximity of the events, i.e., her protected activity beginning in November of 2017 and her nonrenewal in May 2018.  Based upon the evidence presented by Norris, she has made that showing at this stage.

Assuming that Norris can establish a causal link, Norris's claim based on the nonrenewal of her contract faces the additional hurdle that the OCBOE claims that it had a legitimate, nonretaliatory reason for that nonrenewal: Norris's poor performance.   An employee's poor performance is a legitimate, nonretaliatory reason for taking an adverse employment action.  *See Fong v. School Bd. of Palm Beach County, FL,* 590 F.App'x 930, 935 (11th Cir. 2016) (style of teaching); *Entrekin*, 376 F.App'x at 997 (insubordination); *McShane v. U.S. Attorney General*, 144 F.App'x 779, 792 (11th Cir. 2005) (inability to get along with others); *Williams v. Motorola, Inc*., 303 F.3d 1284, 1291 (11th Cir. 2002) (same); *Jolibois v. Fla. Int'l Univ. Bd. of Trustees*, 92 F. Supp. 3d 1239, 1248 (S.D. Fla. 2015), *aff'd*, 654 F.App'x 461 (11th Cir. 2016) (poor performance; failing to follow directions); *Witt v. Franklin Cty. Bd. of Educ*., No. CV-11-S-1031-NW, 2013 WL 832152, at *20 (N.D. Ala. Feb. 28, 2013) (poor demeanor).

---

the biased recommendation of a party with discriminatory animus, but no power to actually discharge the employee. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id*.

At this stage of the analysis, no matter what, the OCBOE's proffer of a legitimate reason for nonrenewal shifts the burden back to Norris to provide evidence from which a reasonable jury could conclude that such reason was pretextual.

To establish pretext—or that an employer's stated reasons are not its real reasons for an adverse action—an employee can show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision." *Walker v. NationsBank of Fla., N.A*., 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J., concurring). Evidence of pretext can include temporal proximity, *lack of a clear and consistent proffered reason*, and deviation from procedures. *Spakes v. Broward Cty. Sheriff's Office*, No. 06-61471-CIV, 2007 WL 9653286, at *7 (S.D. Fla. Oct. 31, 2007) (emphasis added). An employee does not need to present "additional, independent evidence" beyond that of her prima facie case. *Id*.  But, her evidence must be sufficient to allow a reasonable jury to conclude that the employer's proffered reasons did not truly motivate its actions.  *Diamond v. Hospice of Fla. Keys, Inc*., 677 F.App'x 586, 595 (11th Cir. 2017).

Norris first cites various written evaluations performed by school staff that contradict the administrators' claims that her performance was unsatisfactory, let alone so poor that she should be nonrenewed.  Pointing to these evaluations, Norris disputes the OCBOE's characterizations of her performance as gauged by Dr. Simpson, stating "every single administrator of the OBE who was deposed, testified that Mrs. Norris provided FAPE to each of her students according to the IEP of each student published by the OBE IEP Team." (Doc. 59, p. 30.)  In other words, according to Norris, she satisfactorily met

her and the school's legal obligations to provide FAPE in accordance with her classroom students' IEPs, and that none of the school administrators, including Principal Carpenter, the two paraprofessionals that were in her class daily, or the special education coordinator ever stated differently.

Furthermore, Norris notes that the only individuals that were not providing FAPE or following the required IEPs *were the P.E. teachers who accused Norris of abuse*, who the hearing officer found were violating IEPs, and who were not terminated or disciplined in any significant manner. (Doc. 59, p. 35.)

Norris further challenges the Board's reliance on Dr. Simpson's deposition testimony on the basis that he himself acknowledged that he had no opinion about whether Norris sufficiently provided FAPE and that he had never read any of the IEPs for Norris's students. (Doc. 59, pp. 37-39.)

Finally, Norris argues that the claimed termination decision made in September 2017 by Carpenter, Neighbors, Miller and Landry-Booth, as they testified to in their depositions, contradicted their generally favorable written observations and evaluations of Norris and her teaching practices and performance from both before and after September 2017. (Doc. 59, pp. 40-42.) These written evaluations do not paint Norris in a negative, stubborn, insubordinate light, nor do they (or the deposition testimony for that matter) reveal that Norris had failed to provide FAPE. In addition, Norris points to Dr. Carpenter's deposition testimony in which he corrected several dates of his "contemporaneous" notes, including the date he learned of the alleged incident that was reported to DHR, as indicative of a post-hoc justification for Norris's nonrenewal. (Doc. 58-6, pp. 10-16; *see* Doc. 61, p.

25.) *See Luckey v. Fulton Cty., Georgia*, No. 1:05-CV-714-RWS-AJB, 2006 WL 8432352, at *19 (N.D. Ga. July 13, 2006), *report and recommendation adopted*, No. 1:05-CV-0714-RWS, 2006 WL 8432370 (N.D. Ga. Sept. 7, 2006) (citing *Plotke v. White*, 405 F.3d 1092, 1102-03 (10th Cir. 2005) (holding that defendant's "post-hoc reasons for [plaintiff's] termination ... constitute[d] evidence of pretext")).

Still, despite the fact that various evaluations were in accord that Norris was providing FAPE, whether that was simply a reflection that she was meeting the minimal legal requirements for the OCBOE's students is a different question. Apparently, that standard was not the measure by which Dr. Simpson was gauging Norris's performance. Instead, Dr. Simpson's concerns arose from Norris's failure to implement his own personal recommendations.  It was these failures, and not the failure to meet a legally minimal FAPE standard that, according to the administrators, led them to decide in September not to renew Norris's contract for the next year.  But again, such issues are not reflected in the written evaluations of Norris, nor was Dr. Simpson a decisionmaker.  These discrepancies are disputed issues of material fact that are best considered by the factfinder. By underscoring the inconsistencies between her generally favorable performance evaluations and testimony that unsatisfactory performance motivated the OCBOE's nonrenewal decision, Norris has offered enough evidence at this stage to hit the OCBOE's proffered reasons head on.  The performance deficiencies on which the OCBOE relies may or may not be the actual reason for Norris's nonrenewal, but that will be for the jury to consider.

### C. DHR Report – Causation and Pretext

The OCBOE also argues there is no causal link between Norris's protected

activity and the OCBOE's child abuse report to DHR. According to the OCBOE, the DHR report came "as a result of information from two teachers whom Principal Carpenter had known for a long time and had no reason to doubt the veracity of their observations of Norris's conduct towards student C.C." and because Principal Carpenter (or generally, the OCBOE) was a "mandatory reporter" under Alabama Code § 26-14-3.[12] (Doc. 52, p. 46.) In other words, according to the OCBOE, Principal Carpenter and the OCBOE had a mandatory obligation under Alabama law to report Norris to DHR based upon the complaints of two other employees. This, therefore, broke any causal connection chain, so argues the OCBOE in its briefs. At oral argument, however, the OCBOE walked back the assertion that it was obligated to report Norris when it acknowledged that it was under no obligation to report a frivolous complaint of abuse.

Norris has provided evidence that the DHR report came within approximately three weeks of the date that C.W.'s father filed a request for a due process hearing, within three weeks of the Bailey memorandum, and within two weeks of Norris's participation in the pre-resolution meeting involving the P.E. teachers' segregation of C.W. in P.E. It is likely true that the temporal proximity of the DHR report is too remote as it concerns Norris's initial November 2, 2017, communication with Principal Carpenter about the tape barrier if the inquiry is isolated to that one specific event. However, the DHR report is not too remote as it concerns the March 28, 2018, meeting between Norris and C.W.'s father, the

---

[12] In pertinent part, Alabama Code § 26-14-3 provides that "All . . . public and private K-12 employees, school teachers and officials, . . ., when the child is known or suspected to be a victim of child abuse or neglect, shall be required to report orally, either by telephone or direct communication immediately, and shall be followed by a written report, to a duly constituted authority."

March 29, 2018, memorandum, the April 13, 2018, pre-resolution meeting, or any of the other more recent complaints Norris made to Principal Carpenter about the tape barrier. *See Robinson v. LaFarge N. Am., Inc.*, 240 F.App'x 824, 829 (11th Cir. 2007) (finding causation was sufficiently alleged where adverse action occurred about two months after protected activity); *but see Williams v. Waste Mgmt., Inc.*, 411 F.App'x 226, 230 (11th Cir. 2011) ("Even if we considered this time frame, the two-month gap may be 'closer' in time, but it is not 'very close.'"); *Thomas v. CVS/Pharmacy,* 336 F.App'x 913, 915 (11th Cir. 2009) (per curium) (three-and-a-half months is too remote to infer causation). Therefore, the Court concludes that Norris has meet her prima facie burden as it concerns the DHR report based on temporal proximity. *Cf. L.V. v. New York City Dep't of Educ.*, No. 19CIV5451ATKHP, 2020 WL 4677317 (S.D.N.Y. Aug. 12, 2020) (also finding that the facts alleged regarding a bad faith child abuse/neglect complaint in retaliation for protected conduct under the ADA and Rehabilitation Act were sufficient to overcome the presumption of good faith, albeit at the motion to dismiss stage); *see also A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687 (6th Cir. 2013) (finding causation could be inferred where adverse action transpired just under one month after the protected activity, and further noting the question of retaliatory motive for making report of child abuse where the allegations made in the report were not "reasonably informed" should be left to a jury).

However, that is not the end of the inquiry, as the OCBOE claims that it had a legitimate, nonpretextual reason for reporting Norris to DHR.  To do so, it recounts that two P.E. teachers reported to Principal Carpenter as having personally observed Norris grab and carry a student by an arm and leg and subsequently drop him. According to the

P.E. teachers, this instance constituted abuse. The OBCOE argues that under the law, it (primarily Principal Carpenter) had a mandatory obligation to report this abuse to DHR. But again, as the OCBOE has acknowledged, reporting is not necessarily mandatory. There is, as the OCBOE ceded during oral argument, some degree of flexibility and discretion, as the OCBOE admits that it is under no obligation to report frivolous complaints.

Moreover, Norris argues that there is sufficient evidence to show pretext because Principal Carpenter's report was "made in bad faith to punish Mrs. Norris for protecting a disabled child's right to FAPE under IDEA." (Doc. 59, p. 30.)   As grounds for this assertion, Norris notes that the OCBOE never questioned Norris or the victim about the alleged incident prior to reporting Norris to DHR and cites to deposition testimony that the OCBOE had never previously reported a teacher for abuse.  Norris also notes that the child abuse report came at the same time as the due process complaint against the OCBOE, that one of the teachers drafted a memorandum about the OCBOE and the teachers being sued, that one of the administrators made the statement that Norris was not on "Team Opelika," that Principal Carpenter misrepresented to DHR what he had learned from the two paraprofessionals who were with Norris when the abuse occurred, and that DHR ultimately found Principal Carpenter's statements not credible. She also notes that her accusers were mandatory reporters, but they themselves did not report Norris.  And most importantly, Norris points to the fact that the P.E. teachers who reported her were the same ones that Norris had repeatedly told Principal Carpenter were violating the law by implementing the tape barrier.  It is, at the very least, plausible that the P.E. teachers' accusations were false,

unjustified and retaliatory, and further that Principal Carpenter was aware of their bias and retaliatory motivations and had discretion not to make the child abuse report to DHR.

The question is whether this Court, without more than Norris's suspicion that the child abuse report was made in bad faith, can find that Norris has sufficiently shown the stated reasons for the DHR report were pretextual. *See Johnson v. Miami-Dade County*, 948 F.3d 1318, 1329 (11th Cir. 2020) (citing *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our *sole concern* is whether *unlawful discriminatory animus* motivates a challenged employment decision.") (emphases added)); *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a *discriminatory* reason.") (emphasis added), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc).  Again, by demonstrating the inconsistency between the OCBOE's proffered legitimate reasons, Norris has satisfied her burden.  The coincidentally-timed accusations of child abuse by the P.E. teachers, who themselves were the target of Norris's complaints of a violation of the law, and who were aware that these complaints were leading C.W.'s parents to file a lawsuit against the OCBOE and the teachers, is sufficient to rebut the non-pretextual reasons given by the OCBOE. *See Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015) (holding that reporting the plaintiff for child abuse based at least in part on retaliatory motive, even if not materially false, precluded summary judgment for the defendant).  Accordingly, this Court concludes that the OCBOE

is not entitled to summary judgment as it concerns the DHR report of child abuse.

## IV.   CONCLUSION

For the reasons set forth above, Defendant Opelika City Board of Education is not entitled to summary judgment.  Accordingly, it is hereby ORDERED as follows:

(1) Plaintiff's Motion to Supplement Summary Judgment Record (Doc. 74) is GRANTED;

(2) Defendant's Motion for Leave to File (Doc. 84) is GRANTED; and

(3) Defendant's Motion for Summary Judgment (Doc. 51) is DENIED.

DONE and ORDERED this 18th day of November, 2020.

　　　　　　　　　　　　/s/ R. Austin Huffaker, Jr.
　　　　　　　　　　　　R. AUSTIN HUFFAKER, JR.
　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE